IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

TREMAYNE CALVERT                                                                               PLAINTIFF

VS.                                                                                    NO. 1:04CV49-D-D

ELJER PLUMBINGWARE, INC.,                                                            DEFENDANTS
UNITED STEEL WORKERS OF AMERICA
INTERNATIONAL UNION AFL-CIO, and
ELJER LOCAL 523G

OPINION GRANTING MOTIONS FOR SUMMARY JUDGMENT

Presently before the Court are the Defendants' motions for summary judgment. Upon due consideration, the Court finds that the motions shall be granted.

*A. Factual Background*

On August 13, 1999, the Plaintiff, a black male, was hired by the Defendant Eljer as a tank fitter/packer. Eljer manufactures toilets. As an employee of the unionized corporation, the Plaintiff was covered by a collective bargaining agreement. While working as a tank fitter/ packer, the Plaintiff received nine documented warnings one of which was challenged by the union and resolved in his favor. The warnings were primarily for slow production and absenteeism.

Despite a less than perfect record, in November 2001, the Plaintiff bid for and assumed a new position helping dispose of waste created by the manufacturing process. After some period of time, the Plaintiff's new position no longer provided enough hours to support a full-time employee. Rather than reducing his hours, Eljer and the union agreed to add janitorial tasks to the Plaintiff's duties and keep him at the same wage classification. Donnie Loague, production janitor for the first shift, trained the Plaintiff regarding the additional duties. Loague, a white male, enjoyed seniority over the Plaintiff but received a lower wage classification and hourly pay than the Plaintiff.

The Plaintiff suggests that the difference in pay created tension between himself and Loague. As a result, Loague was soon constantly complaining to management that the Plaintiff was not doing his job. Conversely, the Plaintiff contends the situation was actually the reverse; that Loague was leaving too much work for the Plaintiff, who worked the subsequent shift, making it difficult for him to complete all of his duties. The confusion created by this situation caused Eljer to call a meeting in June 2002, to better define the Plaintiff's job description.

On November 10, 2002, the Plaintiff was feeling nauseous as he drove to work. Despite his circumstances, the Plaintiff arrived at work and began his duties. However, the Plaintiff's condition worsened and he approached his supervisor, Gene Laabs, seeking permission to go home. Laabs instructed the Plaintiff to return to work and see if he could finish the rest of the night. The Plaintiff did as instructed and returned to work. Later, the Plaintiff approached Laabs a second time again seeking permission to leave. According to the Plaintiff, Laabs granted him permission by saying "see you, bye" and the Plaintiff left. Eljer and Laabs deny that the Plaintiff was ever given permission to leave.

The next day when the Plaintiff arrived at work he was asked by another supervisor why he left work. The Plaintiff explained that he asked for and was given permission to leave. At the end of his shift, the Plaintiff was asked to stay for a meeting. The Plaintiff met with Vince Wilson, the union steward, and Lynn Iverson, the personnel manager. At the meeting, the Plaintiff was informed that he was being charged with leaving work without permission which if proven accurate would result in immediate termination. The Plaintiff denied the charge but was placed on indefinite suspension beginning on November 12, 2002, pending the results of an investigation.

Following completion of the investigation, another meeting was held on November 18, 2003,

to discuss the results of the investigation. Wilson, the union steward, appeared at the meeting with the Plaintiff. During the meeting, the Plaintiff was shown two statements written by Laabs wherein Laabs denied giving him permission to leave work. The first statement refers to the night of November 10th and describes a conversation that took place between the Plaintiff and Laabs ending with a parenthetical asserting that the Plaintiff never mentioned he was sick or leaving. The second statement is more interesting and provides,

> On Tuesday morning (November 12, 2002) at about 8:30, I was awakened at my home by Tremaine Calvert. He told met that he need a "million-dollar favor." He continued to tell me that he had met with Lynn Iverson and the union president about his alleged leaving work without telling his supervisor. He said that he needed me to do him a favor and tell them that he had told me he was leaving because he was sick. I told him that I would not lie for him. He indicated that he really needed his job, and that it was a good-paying job. As I continued to tell him that I would not lie for him, he continued to encourage me to say that he had told me he was leaving. He asked me if I did not remember his telling me. I told him no. After repeated efforts to get him to understand that I would not lie for him, I turned away and went inside my house.

As a result of these statements and the investigation, Eljer terminated the Plaintiff.

Afterwards, with the assistance of Herbert Arnold, president of the local union, a grievance was filed arguing that the Plaintiff's discharge was unjust and requesting reinstatement and back pay. Predictably, Eljer denied the grievance.[1] Pursuant to the collective bargaining agreement, the union requested a Step II meeting. The meeting took place on January 15, 2003. The Plaintiff and Arnold were present as well as Iverson, the personnel manager. During the meeting, the parties reviewed the grievance, the reasons for discharge and the Plaintiff's visit to Laabs' home. The Plaintiff admits

---

[1] During a phone conversation, presumably before the grievance was filed, Arnold asked the Plaintiff "did you get permission" to leave work on November 10th. According to Arnold, the Plaintiff answered, "no but I told them in the meeting I did." Despite this alleged confession, Arnold defended the Plaintiff throughout the grievance process arguing that the Plaintiff did have permission to leave work.

that Arnold argued for his return to work and presented all of the available evidence. Eljer again denied the grievance.

Subsequently, Arnold requested a Step III meeting. A Step III meeting required the participation of the union's international representative, Claude Karr. Due to scheduling difficulties, the Step III meeting could not be held until September 18, 2003. Arnold brought Karr up to speed on the entire investigation and Karr prepared the Plaintiff for the meeting.[2] When Karr asked the Plaintiff about his disciplinary history, the Plaintiff denied having any problems. At the meeting, Iverson and Ken Krason, plant manager, were present on behalf of Eljer and Karr, Arnold and the Plaintiff were present for the union. Karr represented the Plaintiff at the meeting and argued for his reinstatement and back pay or, in the alternative, without back pay.[3] By letter, Eljer denied the grievance maintaining that the Plaintiff left work without permission.

The parties acknowledged that this was a classic "he said she said" situation. Despite the finger pointing, Karr timely requested that the dispute be submitted to arbitration. Shortly after the request, however, Karr withdrew the grievance. In deposition testimony Karr stated the reasons for withdrawing the grievance included: (1) the lack of corroborating evidence in support of the Plaintiff's position; (2) the Plaintiff's confession that he was not authorized to leave work; (3) the Plaintiff's lack of credibility arising out of his disciplinary history and failure to disclose such information, the confession, and attempting to coerce Laabs to lie for him; (4) the extent of the

---

[2] Arnold, however, neglected to inform Karr about the Plaintiff's alleged phone confession.

[3] Immediately after the meeting, Arnold told Karr about the alleged telephone confession when the Plaintiff admitted he did not actually have permission to leave work. The Plaintiff suggests that the timing is suspicious because Karr requested that the matter be submitted to arbitration despite having knowledge of the confession.

Plaintiff's disciplinary record in light of his short length of time at Eljer; and (5) given all these factors, the unlikelihood of success at arbitration.

Following the Plaintiff's termination, Paul Moore, a white employee and the only bidder, filled the third shift production janitor vacancy. The waste water treatment position was never filled.

The Plaintiff has filed this action claiming that the union breached its duty of fair representation by not pursuing the grievance to arbitration, also alleging claims for violation of the collective bargaining agreement and race discrimination. All Defendants have filed motions for summary judgment.

*B. Standard for Review*

When considering a motion for summary judgment, the movant has the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265, 275 (1986) ("the burden on the moving party may be discharged by 'showing'...that there is an absence of evidence to support the non-moving party's case"). Under Rule 56(e) of the Federal Rules of Civil Procedure, the burden shifts to the non-movant to "go beyond the pleadings and by...affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex Corp., 477 U.S. at 324, 106 S. Ct. at 2553, 91 L. Ed. 2d at 274. That burden is not discharged by "mere allegations or denials." Fed. R. Civ. P. 56(e). All legitimate factual inferences must be made in favor of the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202, 216 (1986). Rule 56(c) mandates the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

trial." Celotex Corp., 477 U.S. at 322, 106 S. Ct. at 2552, 91 L. Ed. 2d at 273. Before finding that no genuine issue for trial exists, the court must first be satisfied that no reasonable trier of fact could find for the non-movant. Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986).

*C. Discussion*

1. Section 301 Claim

The Plaintiff's claims against the Defendants are most analogous to a hybrid action under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Hybrid actions are composed of two elements: (1) an allegation that the employer breached the collective bargaining agreement; and (2) an allegation that the union breached its duty of fair representation. Gibson v. U.S. Postal Serv., 380 F.3d 886, 888 (5th Cir. 2004). Such claims may be brought against the employer, the union or both. Id. at 888. Which ever the case may be, both elements must be proven. Id. However, a fair representation claim against the union is an indispensable predicate for lodging a section 301 claim against an employer. Daigle v. Gulf States Utilities Co, 794 F.2d 974, 979 (5th Cir. 1986). Stated differently, before the merits of any breach of contract claim against an employer can be addressed, the plaintiff must first demonstrate the union breached its duty of fair representation. United Parcel Serv., Inc. v. Mitchell, 451 U.S. 56, 62, 101 S.Ct. 1559, 1564, 67 L. Ed. 2d 732 (1981).

A union has a duty to represent all employees fairly in its enforcement of a collective bargaining agreement. Landry v. The Cooper/T. Smith Stevedoring Co., 880 F.2d 846, 852 (5th Cir. 1989). Thus, the union has an obligation to investigate a grievance in good faith. Id. at 852. To prove a breach of this obligation, the plaintiff must show that the union has acted (1) in a hostile

manner towards his interests; (2) discriminated against him in some fundamental respect; (3) exercised its discretion in a bad faith or dishonest manner; or (4) acted arbitrarily or capriciously while representing him. Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L. Ed. 2d 842 (1967).

The duty of fair representation is breached when the union acts in a "discriminatory, dishonest, arbitrary, or perfunctory manner." Guiterrez v. United Foods, Inc., 11 F.3d 556, 559 n.8 (5th Cir. 1994). The union's actions are arbitrary "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." Air Line Pilot's Ass'n v. O'Neill, 499 U.S. 65, 67, 111 S.Ct. 1127, 1130, 113 L. Ed. 2d 51 (1991) (internal quotations and citations omitted). Simple negligence or mistake in judgment does not amount to a breach of the duty of fair representation. Landry, 880 F.2d at 852. Furthermore, no breach has occurred where the union's "conduct in processing an employee's grievance [is] less than enthusiastic and not perfect." Id. at 852 (internal quotations and citations omitted). The union's decision is entitled to deference when under review by a district court. Air Line Pilots, 499 U.S. at 78, 111 S.Ct. at 1135-36. Significantly, an employee has no absolute right to have his grievance taken to arbitration or any other level of the grievance process. Landry, 880 F.2d at 852; Stanley v. General Foods Corp., 508 F.2d 274 (5th Cir. 1975) (union has a right to conclude that arbitration would be fruitless and decline to arbitrate).

The Plaintiff alleges that the union breached its duty of fair representation by arbitrarily withdrawing the grievance just before arbitration. The Plaintiff attempts to fend off summary judgment by framing Arnold's character as a central and material issue requiring resolution by a jury. For reasons discussed below the Court does not agree.

Since the Plaintiff is alleging that the union acted arbitrarily in refusing to pursue arbitration or by withdrawing the grievance prior to arbitration, the primary question is whether the union's actions/inactions breached the duty of fair representation. Interestingly, the Plaintiff never claims that the union acted with hostility towards him or his interests or discriminated against him in some fundamental aspect. To the contrary, the Plaintiff himself admitted that the union fully investigated the matter, he had union representation at every meeting, and his union representative forcefully argued on his behalf presenting all the evidence available. Before the Step III meeting, the Plaintiff was given the opportunity to produce any new evidence. Yet, he did not provide any illuminating evidence because there is none. No witnesses, no physical evidence, no corroborating proof, only the Plaintiff's word against Laabs'.

Given the Plaintiff's acknowledgments as to the union representation he received both from Arnold and Karr, his burden seems dubious. Despite Arnold's knowledge of an alleged confession, he, nonetheless, conducted an investigation and zealously argued on at least two occasions that the Plaintiff did have permission to leave work on November 10th. Arnold also advocated that the Plaintiff be reinstated with back pay. Later, Karr, with Arnold's assistance, steadfastly argued on the Plaintiff's behalf at the Step III meeting. Then Karr timely requested that the matter be submitted to arbitration. The Plaintiff impliedly agrees he was fairly represented and has presented no evidence to the contrary. In short, assuming the facts as the Plaintiff alleges, by his own admissions, he received fair representation.

So, the Plaintiff's only legal argument is that the union acted arbitrarily in withdrawing the grievance and failing to pursue arbitration. Approximately one month after petitioning for arbitration, Karr withdrew the grievance entirely. As noted above, Karr has clearly articulated

several nonarbitrary and nondiscriminatory reasons for withdrawing the grievance. The Plaintiff takes issue with only one of these– his alleged confession to Arnold that he did not have permission to leave work. Karr has admitted that the Plaintiff's confession was "a factor" in his decision not to arbitrate the dispute. However, Karr carefully described other factors that weighed more heavily in favor of withdrawing the grievance such as the Plaintiff's relatively short employment with Eljer, the Plaintiff's credibility in light of Laabs' statements and the failure to disclose his disciplinary record, lack of supporting evidence, and the unlikelihood of success based on all these factors. Assuming for a moment that Karr's reliance on the alleged confession made to Arnold was an inappropriate consideration, the Plaintiff cannot overcome the other factors weighing against pursuing the grievance process in arbitration.

As acknowledged earlier this is a classic "he said she said" scenario. Unfortunately, the Plaintiff bears the burden of production and persuasion and he must come forward with evidence showing the existence of a genuine issue of material fact. This the Plaintiff has not done and in all likelihood cannot accomplish. "[A] union may refuse to process a grievance or handle a grievance in a particular manner for a multitude of reasons, so long as a union acts in good faith and there is some nonarbitrary basis for its decision." Landry, 880 F.2d at 854 (internal quotations and citations omitted). Despite the Plaintiff's unsupported allegations, there is simply no evidence that the union's withdrawal of the grievance was arbitrary, discriminatory or done in bad faith. To the contrary, the record demonstrates only that the Plaintiff was fairly represented at every step of the grievance process. With all due deference, nor does this Court find that the union's actions were unreasonable or irrational considering the facts of this case. Consequently, the Plaintiff has failed to establish a genuine issue of material fact exists as to his section 301 claim for breach of the duty

of fair representation. Therefore, summary judgment shall be granted. Furthermore, since the Plaintiff has not prevailed on his fair representation claim, he cannot maintain a section 301 claim against Eljer and summary judgment shall also be entered in favor of the employer. United Parcel Serv., 451 U.S. at 62, 101 S.Ct. at 1564.

### 2. Racial Discrimination

In order to establish a prima facie case of race discrimination, a plaintiff must demonstrate (1) that he was a member of a protected class; (2) that he was qualified for the position; (3) that he was discharged; and (4) after he was discharged he was replaced with a person who is not a member of the protected class, Frank v. Xerox Corp., 347 F.3d 130, 137 (5th Cir. 2003), or "shows that other similarly situated employees were treated more favorably." Bryan v. McKinsey & Co., Inc., 375 F.3d 358, 360 (5th Cir. 2004). As is the case here, when there is insufficient direct evidence of discrimination, the McDonnell Douglas burden shifting framework will apply. Evans v. City of Bishop, 238 F.3d 586, 590 (5th Cir. 2000). Once a plaintiff has established a prima facie case, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the discharge. Johnson v. Louisiana, 351 F.3d 616, 621 (5th Cir. 2003). Assuming the defendant employer satisfies this burden of production, the inference of discrimination created by the plaintiff's prima facie showing is discarded. West v. Nabors Drilling USA, Inc., 330 F.3d 379, 385 (5th Cir. 2003). The plaintiff may prevail if he persuades the trier of fact that the employer's proffered reason for the discharge is a pretext for discrimination. Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 897 (5th Cir. 2002). Summary judgment is not appropriate where the plaintiff has presented evidence that creates a genuine issue of material fact as to "either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while

true, is only one of the reasons for its conduct, and 'another motivating factor' is the plaintiff's protected characteristic (mixed motive[s] alternative)." Rachid v. Jack In The Box, Inc., 376 F.3d 305, 312 (5th Cir. 2004) (citations omitted) (interpreting the mixed motive analysis of Desert Palace and applying the modified McDonnell Douglas approach). Throughout the burden shifting framework, the ultimate burden of persuading the trier of fact that the defendant's actions were intentionally discriminatory remains at all times with the complainant. Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 1094, 67 L. Ed. 2d 207 (1981).

Here, the Plaintiff easily overcomes his first obstacle by establishing a prima facie case of racial discrimination. The Plaintiff is a black male; he was qualified for the position; he was terminated; and, the Plaintiff was replaced by someone not within the protected class.[4] The Plaintiff also contends that he was treated differently than other similarly situated employees. For comparison, the Plaintiff points to the favorable treatment Loague allegedly received. The Plaintiff contends that Loague, while training the Plaintiff, "would come and go as he pleased, and would also take lunches whenever he deemed fit." Yet, it is alleged, Loague never received any reprimand for his conduct. Further, the Plaintiff contends that Loague, a white male, repeatedly complained about the Plaintiff's work performance. As a result, the Plaintiff was "chastise" and given more work.

To sustain its burden of production, Eljer maintains that the Plaintiff was terminated for leaving work without permission in violation of general rule 6. General rule 6, of which the Plaintiff was made aware during orientation, provides "leaving your job without authorization is subject to immediate discharge." Clearly, the Defendants have stated a legitimate nondiscriminatory reason

---

[4] The Plaintiff does not expressly pursue this theory. Perhaps the Plaintiff's hesitation is because the white male who filled the janitorial vacancy was the only applicant for the position.

for the adverse employment decision.

The Plaintiff must now come forward with evidence showing either that the Defendant's reason is not true, but is instead a pretext for discrimination or that the Defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the Plaintiff's protected characteristic. In order to create a jury question, there must be "a conflict in substantial evidence." Boeing Co. v. Shipman, 411 F.2d 365, 375 (5th Cir. 1969). Substantial evidence includes "evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." Id. at 374. Further, "[a] mere scintilla of evidence is insufficient to present a question for the jury." Id. However, even if the evidence is more than a scintilla, " Boeing assumes that some evidence may exist to support a position which is yet so overwhelmed by contrary proof as to yield to a directed verdict." Neely v. Delta Brick and Tile Co., Inc., 817 F.2d 1224, 1226 (5th Cir. 1987).

In an attempted to provide substantial evidence, the Plaintiff argues, "when you consider that Mr. Calvert successfully completed his tasks as to warrant his job completed, was constantly under the complaints of his white counterpart, Mr. Loague, and all the while still juggling two job responsibilities, a jury could infer that Mr. Calvert was the subject of racial discrimination." In combination with the facts, this represents the Plaintiff's entire case. He has not presented any evidence and barely little argument demonstrating that the Defendant's articulation is pretext for discrimination. Other than his own statements and subjective beliefs, the Plaintiff has not even submitted any proof corroborating the purported preferential treatment Loague received. To warrant the consideration by a jury the Plaintiff must do more.

It is routinely recognized that a plaintiff's own subjective beliefs no matter how sincere

cannot alone support a charge of discrimination. Marks v. St. Landry Parish Sch. Bd., No. 02-31217, 2003 WL 22080747 at *2 (5th Cir. Sept. 9, 2003) (holding that a plaintiff's subjective belief he has been the victim of discrimination, no matter how sincerely held, cannot alone serve as a basis for judicial relief); Elliot v. Group Med. & Surgical Serv., 714 F.2d 556, 564 (5th Cir. 1983) (same). This is even more forceful "in the face of adequate, nondiscriminatory reason for discharge." Portis v. First Nat'l Bank of New Albany, Miss., 34 F.3d 325, 329 (5th Cir. 1994). Such is the case here. The Defendant has supported its nondiscriminatory basis for termination with ample evidence. The Defendant's evidence easily overwhelms the Plaintiff's deficient case which is built entirely on his own testimony and suspicion.

It is not the Court's duty to question the prudence of the Defendant's judgement, nor to speculate and search for discriminatory meaning behind every act. It is, however, the Plaintiff's responsibility to demonstrate the existence of a jury issue regarding the "employer's discriminatory animus or the falsity of the employer's legitimate nondiscriminatory explanation." Sandstad, 309 F.3d at 897. The Plaintiff has done neither. The Plaintiff has failed to reveal any discriminatory intent or disclose that the Defendant's reason for discharge was fictitious. Rather, the Defendant is entitled to reasonably rely in good faith upon complaints of other employees. Waggoner v. City of Garland, Tex., 987 F.2d 1160, 1165-66 (5th Cir. 1993); also Johnson v. Louisiana, 369 F.3d 826, 821-22 n.7 (5th Cir. 2004) (restating the proposition). Although the Plaintiff has not raised the issue, the Court finds that the Defendant relied on Laabs' statements in good faith and acted rationally after conducting a reasonable investigation. The Plaintiff has offered nor proven anything to the contrary. Accordingly, the Court finds that the Plaintiff has failed to demonstrate the existence of a genuine issue of material fact. Therefore, summary judgment is appropriate as to the Plaintiff's claim of

racial discrimination.

## D. *Conclusion*

In accordance with the discussion above, the Plaintiff has been unable to demonstrate disputed issues of fact suitable for a jury's consideration. Specifically, the Plaintiff did not prove that the union breached the duty of fair representation. Consequently, this failure precludes any claim against Eljer for breach of the collective bargaining agreement. Finally, the Plaintiff did not substantiate his claim of racial discrimination with any evidence beyond his own suspicions. Therefore, summary judgment shall be granted for the Plaintiff's claims as to all Defendants.

SO ORDERED, this the 19th day of July 2005.

/s/ Glen H. Davidson
Chief Judge